UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY LUJAN GAMINO,<br><br>        Petitioner,<br><br>    v.<br><br>ROBERT H. TRIMBLE, Warden,<br><br>        Respondent. | Case No. 11-4466 JST (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |

Before the Court is the above-titled pro se petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Gary Lujan Gamino, challenging the validity of a judgment obtained against him in the Santa Clara County Superior Court. Respondent filed an answer to the petition. Petitioner has filed a traverse. For the reasons discussed below, the petition is DENIED and a certificate of appealability is DENIED.

**PROCEDURAL HISTORY**

On August 15, 2008, a jury found Petitioner guilty of three counts of committing a lewd act on a child under fourteen and found true special allegations that two of the offenses involved substantial sexual conduct. Respondent's Ex. 1, Clerk's Transcript (CT) at 580-83; Ex. 2, Reporter's Transcript (RT) at 1584-86. On August 18, 2008, the trial court found the prior conviction allegations to be true. CT 586; RT 1610-11. On December 18, 2008, the court sentenced Petitioner to a total term of 150 years consecutive to ten years. CT at 722-24; RT at 1649-50.

Petitioner appealed his convictions to the California Court of Appeal and, in the same court, filed a petition for a writ of habeas corpus raising one claim for relief. Respondent's Exs. C, F. On September 21, 2010, in an unpublished opinion, the Court of Appeal denied all claims for relief with the exception of the claim based on improper sentencing. On this ground, the court reversed the judgment and remanded for resentencing under the correct standard for consecutive sentences. Respondent's Ex. I, People v. Gamino, 2010 WL 3639310 (Cal. Ct. App. Sept. 21, 2010) (unpublished). In the same order, the court summarily denied the habeas petition. On December 21, 2010, the California Supreme Court summarily denied review of the direct appeal and the habeas petition. Respondent's Exs. K, M.

On February 7, 2011, the trial court resentenced Petitioner to seventy-five years to life consecutive to five years. Respondent's Ex. N.

On September 7, 2011, Petitioner filed this petition for a writ of habeas corpus. The matter is now fully briefed and is ready for review on the merits.

**STATEMENT OF FACTS**

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[1]

> Defendant lived with his wife in San Jose. On July 28, 2006, the wife's cousin from Tracy visited the couple to join a group for a boating trip set for the next day. She was accompanied by her two daughters, the 11-year-old victim and 13-year-old B.L. Also along were the daughters' 14-year-old girlfriend and the cousin's boyfriend. At some point, the three young girls went shopping by themselves. When they returned, others had gathered in the home. Eventually, defendant's son, defendant's friend, the friend's wife and two children, defendant's stepson, and the stepson's friend had joined the group. During the evening, the children were watching television in the living room and the adults were watching the cousin's boyfriend give defendant a tattoo in the kitchen. After midnight, defendant and his wife argued because the adults were still drinking alcohol and she wished to go to bed. The wife left for bed and announced that she would lock the door to their bedroom. By 3:00 a.m., defendant's stepson and the stepson's friend had gone to

---

[1] This summary is presumed correct. See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

bed and defendant's friend and the friend's wife and children had left the home. The victim's mother and her boyfriend retired to a room near the kitchen; defendant retired to a living room couch; the victim retired to another couch in the living room; and the victim's sister and girlfriend retired to the floor less than a foot from where the victim settled.

After an interim, the victim felt defendant pulling on her pants. She did not open her eyes because she was scared. Underneath a blanket, defendant pulled down the victim's underwear and exposed her vagina. He touched the outside of her vagina with two fingers and moved them up and down. He took away his fingers and licked them. He then put the wet fingers back on the outside of the victim's vagina and moved them up and down. At some point, he stopped and the victim heard him return to his couch. The victim heard her mother's door open and the mother's boyfriend exiting the room to check up on the girls in the living room. Afterward, the boyfriend returned and closed the bedroom door. The victim then heard defendant get off his couch and approach her again. Defendant pulled up the victim's shirt and bra and grabbed one of her breasts with his hand. He then started to lick the breast and neck. He stopped after one minute and pulled down the shirt and bra. The victim then heard defendant return to his couch.

The victim heard her mother's door open and close. She got up, started to cry, and walked into her mother's room where her mother and the boyfriend were awake. Still scared and crying, she announced that she had been molested without identifying defendant. Her sister and girlfriend came into the room while her mother questioned her. Defendant's wife came into the room. Defendant separately came into the room. The victim said to defendant, "Don't talk to me." Defendant's stepson and the stepson's friend came into the room. When the victim again said that she had been molested, defendant said more than once, "Oh, it must have been a bad dream." The victim then asked her girlfriend to join her in the bathroom. In the bathroom, she told the girlfriend that defendant had molested her. The two left the bathroom and returned to the mother's bedroom. The victim and her mother then went into the living room and sat on the couch. Still scared and crying, the victim told her mother that defendant had molested her.

While the mother's boyfriend was packing the family's belongings to leave the home, defendant announced in the living room that, "I think it was [the mother's boyfriend]." While the family was inside a pick-up truck preparing to leave, defendant said to the mother's boyfriend, "I didn't molest her. If I wanted to molest somebody, I'd have molested [the victim's sister or girlfriend]."

The family stopped at a restaurant where the mother telephoned her older son in Tracy. The victim took the phone and told her brother what had happened. The brother then drove to San Jose with two friends and met the family at the restaurant. He, one of his friends, the mother's boyfriend, and the victim then drove to defendant's home and confronted defendant. Defendant said, "I don't know why you guys want to do this to me. I don't know why you guys want to mess up my life . . . What is it going to take for you guys to leave me alone?" He offered the

3

brother money. He offered to accept physical punishment. The brother then called the police.

Officer Nathaniel Bennett arrived at about 9:30 a.m. on July 29, 2006. He took a 15-minute recorded statement from the victim that related the above events. He then transported her to the hospital for a sexual assault examination where the doctor took swabs of the victim's breast and genital areas. A criminalist later tested the swabs for saliva. Her findings were negative as to the genital area and inconclusive as to the breast area. For DNA testing, she made cuttings from the areas and, as a control sample, the shoulder area. Another criminalist reviewed the DNA analysis and testified that the genital area had two contributors, the victim was a major contributor, and defendant could not be ruled out as a minor contributor. She added that the breast area also had two contributors, the victim was a minor contributor, and defendant was a major contributor. She concluded that the DNA results were consistent with the victim's description of the sexual assault.

Detective Monica de la Cerda interviewed the victim on July 31, 2006. The victim related the events in a manner consistent with her statement to Officer Bennett.

According to defendant's wife, the victim touched defendant while he was bleeding and sweating during the tattoo administration. According to defendant's son, the victim rinsed the rag that her mother's boyfriend had used to wipe the tattoo ink and defendant's blood.

Defendant's theory was that the mother's boyfriend had molested the victim. Defendant introduced evidence that the boyfriend had molested his eight-year-old niece in 1997. His expert opined that the boyfriend could not be excluded as a contributor to the genital area DNA.

Gamino, 2010 WL 3639310, at *1-3.

## DISCUSSION

### I. Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

4

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In other words, federal habeas relief is available only if the state court's application of federal law is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'" Nevada v. Jackson, __ U.S. __, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 786 (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view

different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002). When confronted with such a decision, a federal court should conduct an "independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

Here, as noted, the California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions, which contain the one claim Petitioner asserts in his federal petition for habeas relief. Because there is no reasoned state court decision on this claim, the Court independently reviews the record to determine whether the state court's summary rejection was an objectively unreasonable application of clearly established federal law.

**II. Petitioner's Claim**

In his habeas petition to the state court, Petitioner asserted that his constitutional rights to present a defense and to effective assistance of counsel were violated by the trial court's refusal to grant a mistrial or continuance after learning of the irreconcilable conflict between trial counsel and her DNA expert. Respondent's Ex. L, Petition for Habeas Corpus Review in California Supreme Court at i, 11. In his federal petition, citing Ake v. Oklahoma, 470 U.S. 68, 76, 83 (1985), Petitioner asserts the one claim that he was denied his constitutional right to present a defense because the trial court denied him a competent DNA expert to assist in the evaluation, preparation and presentation of his defense. Traverse at 1.

6

**A. Trial Court Proceedings**

In this petition, Petitioner refers to the declaration of defense counsel, Lucy McAllister, which he submitted with his state petition for habeas corpus relief. Respondent's Ex. F, Petition for a Writ of Habeas Corpus in California Court of Appeal, Ex. 1, Declaration of Lucy McAllister (McAllister Dec.). In her declaration, defense counsel stated the following. After Petitioner retained Ms. McAllister to represent him in his felony criminal case, she retained Dr. Ruth Ballard, a DNA expert, to assist her because the prosecution's case against Petitioner was based substantially on DNA evidence. McAllister Dec. ¶¶ 1, 3. When Dr. Ballard was retained, Petitioner paid her on an installment basis from his earnings as a truck driver and his landscaping business. Id. at ¶ 2. However, after Petitioner was remanded to custody at the conclusion of his preliminary hearing, he was unable to continue to make installment payments to Dr. Ballard. Id. at ¶ 5. Counsel then submitted to the court an application for expert fees in the amount of $14,908, which the court granted on September 7, 2007. Id. at ¶¶ 6, 7. In July, 2008, the court granted a request for additional expert fees of $9,300. Id. at ¶ 8.

Petitioner's trial commenced on July 9, 2008. Id. at ¶ 9. On July 17, 2008, Dr. Ballard testified at a California Evidence Code section 402 hearing to determine the scope of her trial testimony. Id.[2] The court ruled that Dr. Ballard would not be permitted to testify about a saliva experiment that she had performed. Id. In the days following this hearing, a disagreement developed between counsel and Dr. Ballard regarding payment for her services, preparation for her testimony and assistance in preparation for the cross-examination of the prosecution's DNA expert. Id. at ¶¶ 11-23.

On July 28, 2008, counsel informed the court that Dr. Ballard "refused to testify." RT at 751. The court held a hearing on the matter. RT 802-39. Regarding Dr. Ballard's past and future fees, the court stated:

---

[2] California Evidence Code section 402 provides that, when the existence of a preliminary fact is disputed, its existence or nonexistence may be determined by the court holding a hearing and determining the question of admissibility of evidence out of the presence of the jury.

7

> All bills will now be provided to me. And I will review what you—what you've done. And you will explain to me, after the trial, how it was that these costs were incurred. And if I think they're reasonable, I'm going to be the one to decide, at the end of trial, what you'll receive. And then those costs will be paid.

RT at 820-21.

Dr. Ballard stated that she had "other ethical issues concerning this case," and the court held a hearing outside the presence of the prosecutor. RT at 822.[3] Following the closed session, defense counsel moved for a mistrial on the ground that a breach of trust had developed between herself and Dr. Ballard such that "Dr. Ballard finds herself unable to testify." RT at 856. The court replied, "She just told me she was going to testify." RT at 856. Defense counsel continued to argue for a mistrial based on a breach of trust in how Dr. Ballard made herself available to the defense and, if she did testify, there was no guarantee that she would "testify in the way in which they had previously discussed or consistent with prior expectations." RT at 856. Defense counsel argued that if a mistrial was not granted, she requested a continuance so that she could find a replacement for Dr. Ballard. RT at 857.

The prosecutor commented that, if Dr. Ballard was willing to testify, she would probably not be willing to jeopardize her professional reputation by perjuring herself because she was upset with defense counsel. RT at 859. The court then asked Dr. Ballard if that was correct. Dr. Ballard replied, "That would be correct. I intend to tell the truth in the matter. . . . I've gone through things to the best of my ability. I'll continue to do that. And I will testify honestly and—and to the best science that I'm aware." RT at 859-60. The court then ruled:

> Well, I'm satisfied with your representations, Dr. Ballard. And thank you very much for—for your—for being so professional and so accommodating. We appreciate that.

---

[3] Pages 823-835 and 840-855 of the Reporter's Transcript are sealed. Respondent indicates that he was not provided a copy of the sealed transcript and Petitioner has not provided a copy to the Court.

8

> So I'm going to deny the motion for mistrial and the motion for continuance. We have an expert here who's ready, willing and able to tell the truth. And that's all that we can expect in a - -
>
> No. You're done, Ms. McAllister. You've made your comments. I'm speaking now.
>
> So I'm going to deny the request for mistrial and—the motion for a mistrial and for a continuance. And we will proceed.

RT at 860.

Dr. Ballard then sat next to counsel to assist her during the testimony of Lynne Burley, the prosecution DNA expert. RT at 860-61. The court stated it would allow a recess if Dr. Ballard wanted to discuss any questions she thought defense counsel should ask the prosecution expert. RT at 861. When defense counsel noted that Dr. Ballard did not have her materials with her, the court stated that Dr. Ballard was not testifying and arranged for Dr. Ballard to be provided with copies of the prosecution's materials, including Ms. Burley's report. RT at 865-66.

On August 11, 2008, the court held a section 402 hearing on whether Petitioner would be allowed to present a third party culpability defense. RT at 1067-1112. Dr. Ballard testified that, based on her analysis of the DNA evidence, she concluded that Adam Pheng could not be excluded as a possible contributor to the DNA in the samples taken from the victim's genital area. RT at 1077. Dr. Ballard was subjected to cross-examination by the prosecutor. RT at 1079-1106. The court ruled that Dr. Ballard's testimony regarding third party culpability would be admitted because it could raise a reasonable doubt as to some of the charges against Petitioner. RT at 1112.

Dr. Ballard testified before the jury that same day. RT at 1117-1190 (Direct Examination); 1190-1211, 1216-30 (Cross-Examination); 1230-32 (Redirect).

On August 12, 2008, the prosecution called in rebuttal Teresa Shab and Amanda Cardenas, experts in DNA from the Santa Clara County Crime Lab and, on August 13, 2008, the prosecution recalled DNA expert Burley. McAllister Dec. at ¶ 29. Defense

counsel states that she asked Dr. Ballard to be present those days, but she was not available. Id. Defense counsel states that she moved for a continuance so that Dr. Ballard could be present during the testimony of these witnesses, but the court denied this request. Id. However, the record does not indicate that counsel made such a motion to the court. RT at 1275-1379 (DNA experts' rebuttal testimony).

The record indicates that, on August 13, 2008, before Ms. Burley resumed her testimony in rebuttal, defense counsel indicated that she was concerned with discovery the prosecution had provided to her the previous day because it was new information that she had not previously seen. RT at 1386-87. Counsel stated that she had contacted Dr. Ballard to see if she was available but she had been subpoenaed to testify in another case. RT at 1387. The prosecutor responded that all but one of the documents she provided to defense counsel had been previously disclosed and the one document that had not been disclosed was work product which did not contain new material but which explained Ms. Burley's findings. RT at 1387-91. Counsel moved for a continuance until Dr. Ballard was available and for a jury instruction regarding late discovery. RT at 1391-92. The court denied counsel's motions, stating, "I'm going to deny the defense motion. All this material seems to me to be not very fresh. I know I've heard it before. In reading through this it's all very familiar to me from the testimony of previous witnesses. And I think that the defense is being overly dramatic in terms of the import of this document. And I think part of it is work product, and the rest of it I think we've heard before. So, I'm going to deny the defense motion." RT at 1395-96.

Defense counsel cross-examined the prosecution's rebuttal witnesses at length. RT at 1287-92 (Shab cross-exam); 1328-53 (Cardenas cross-exam); 1426-58 (Burley cross-exam). In her closing argument, counsel argued that the scientific evidence did not support the prosecution's case because: (1) no evidence showed how DNA got on the victim's breast; (2) the DNA that was found on the breast could have gotten there through indirect or direct transfer, not through licking; (3) because Petitioner lived in the house where the charged offenses occurred, his DNA was everywhere such as on bathroom towels, the

couch where the victim slept, and dishes and cups; (4) no saliva was found on the victim's genital area where she said Petitioner rubbed his fingers after he had licked them with his saliva; and (5) the genital area DNA evidence did not exclude Adam Pheng, who had a prior conviction for molesting a child, as the perpetrator. RT at 1549-66.

### B. Federal Authority

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fourteenth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)). At a minimum, this means that criminal defendants have the right to put before a jury evidence that might influence the determination of guilt. Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987). This right is implicated when the evidence the defendant seeks to admit is relevant and material and vital to the defense. Jackson v. Nevada, 688 F.3d 1091, 1096 (9th Cir. 2012) (quoting Washington v. Texas, 388 U.S. 14, 16 (1967)). The ability of an indigent defendant to present an adequate defense includes the right to be provided with the basic tools with which to present such a defense, such as a psychiatrist to aid counsel in crafting a defense and testifying on his behalf. Ake v. Oklahoma, 470 U.S. 68, 76, (1985) (when defendant demonstrated that his sanity at time of offense was a significant factor at trial, the state had to assure access to a competent psychiatrist who would conduct an examination and assist in evaluation, preparation and presentation of the defense).

### C. Analysis

Petitioner contends that he was denied his right to present a complete defense when, on July 28, 2008, the trial court denied his motions for a mistrial or a continuance to allow counsel time to employ another DNA expert. Based on counsel's declaration, Petitioner argues that, from July 18 until the conclusion of testimony in his trial on August 13, 2008, he was effectively denied the services of a DNA expert.

11

The record shows that counsel had the effective assistance of a DNA expert, Dr. Ballard, during the time leading up to the trial and through the trial until the day the prosecution called DNA experts to testify in rebuttal. The record also shows that the court agreed to pay Dr. Ballard's expenses after Petitioner was no longer able to pay for them. The court first authorized payment in the amount counsel requested of $14,908. The court then authorized payment of an additional $9,300. Given that Dr. Ballard's billing rate was $200 per hour, payment of the total amount of $24,200 meant that, up to July 28, she spent over 120 hours working on Petitioner's case. Furthermore, at the July 28 hearing regarding Dr. Ballard's fees, the court stated it would authorize additional fees incurred by Dr. Ballard, as long as they were reasonable. Therefore, the court cannot be faulted for failing to pay Petitioner's fees for a DNA expert to assist in the preparation of his defense.

Furthermore, although counsel stated to the court that Dr. Ballard refused to testify at the July 28 hearing, after the court resolved the issue of Dr. Ballard's fees, Dr. Ballard told the court that she would testify truthfully and honestly and to the best science of which she was aware. The court stated that it was satisfied with her representations. Thereafter, Dr. Ballard testified effectively at the 402 hearing regarding Petitioner's third party defense, convincing the court that her testimony could raise a reasonable doubt as to some of the charges against Petitioner. Dr. Ballard also testified extensively in front of the jury for the defense and withstood extensive cross-examination. Although Dr. Ballard was not present for the prosecution's DNA rebuttal witnesses, from counsel's cross-examination of these witnesses, it appears that she was well-prepared to question them on their testing procedure and results. It also appears that counsel was able to establish the salient points of the defense: that no saliva was found on the victim's genital area although the victim accused Petitioner of touching her there with fingers he had licked; that it could not conclusively be determined that Petitioner was a contributor to the DNA found at the genital area; that it was possible that a third party was a contributor of the DNA at the genital location; and that Petitioner's DNA found at the victim's breast area could have gotten there through indirect transfer, and not through licking. Counsel cogently argued

12

United States District Court
Northern District of California

1 these points to the jury in her closing argument.

2 Neither Petitioner nor his counsel identifies any facts that Dr. Ballard might have
3 provided that were not brought out in her testimony. Certainly the Court cannot conclude
4 unaided that, after almost a full day of testifying for the defense on direct, cross, re-direct
5 and re-cross examination, Dr. Ballard had unstated, helpful testimony left to give.
6 Furthermore, although counsel did not have Dr. Ballard's assistance in cross-examining
7 the rebuttal witnesses, there is no showing that her absence impeded defense counsel's
8 performance. Petitioner simply has not demonstrated that any inadequacy in Dr. Ballard's
9 performance might have changed the result of his trial, and the state appellate courts were
10 therefore reasonable in denying relief. Caldwell v. Mississippi, 472 U.S. 320, 323, 105 S.
11 Ct. 2633, 2637, 86 L. Ed. 2d 231 (1985) ("Given that petitioner offered little more than
12 undeveloped assertions that the requested assistance would be beneficial, we find no
13 deprivation of due process in the trial judge's decision."); Williams v. Stewart, 441 F.3d
14 1030, 1059 (9th Cir. 2006), amended, 01-99015, 2006 WL 997605 (9th Cir. Apr. 18, 2006)
15 ("Williams offers no affidavits from medical experts supporting that the two experts were
16 incompetent, gives no list of the tests that in his view should have been conducted or what
17 those tests may have shown, and offers no evidence showing that the tests that the experts
18 conducted were incomplete. Because the record does not contain evidence from Petitioner
19 indicating that the prior medical experts were incompetent, the district court correctly held
20 that this claim does not require relief.").

21 Petitioner argues that he cannot determine how he was prejudiced by Dr. Ballard's
22 performance without hiring a new DNA expert to review the DNA evidence at his trial and
23 the trial testimony of the DNA experts. He requests that this Court grant funding for a
24 DNA expert to undertake this work. Petitioner's request for funds to hire a DNA expert is
25 denied, as is his request for appointment of counsel, apparently to aid him in the hiring of a
26 DNA expert. See Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005) (on habeas review,
27 evidentiary hearing only required if petitioner has alleged facts that, if proven, would
28

13

entitle him to habeas relief and he did not receive a full and fair opportunity to develop those facts in state court).

Finally, Petitioner relies on Ake, 470 U.S. at 76-77, for the principle that fundamental fairness entitles indigent defendants to the services of an expert to assist them in the preparation and presentation of the defense. In Ake, the prosecution presented the testimony of an expert but the court denied the defendant funds to hire his own expert. Here, the court authorized over $24,000 for Petitioner's DNA expert. The court also ruled that it would pay for fees the expert incurred in the future, so long as they were reasonable. This case is not Ake.

For all the reasons stated above, the Court, in its independent review of the record, finds that the state court's rejection of Petitioner's claim was not an objectively unreasonable application of established Supreme Court authority or an unreasonable determination of the facts based on the state court record. Accordingly, the petition for a writ of habeas corpus is denied.

### III. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing and, accordingly, a certificate of appealability is denied.

/ / /

**CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED**.

Dated: August 15, 2013

_____
JON S. TIGAR
United States District Judge